## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES APOSTLE, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| ) ) | **CIVIL ACTION NO. 1:08-cv-07431-UA** |
| Plaintiff, ) ) | |
| vs. ) ) ) | CLASS ACTION COMPLAINT |
| CIT GROUP  INC.,  JEFFREY M. PEEK and JOSEPH M. LEONE, ) ) ) ) | |
| ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) ) | |

Plaintiff, James Apostle ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CIT Group Inc. ("CIT" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of CIT's securities between April 18, 2007 and March 5, 2008 inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     CIT is a commercial finance company that provides financial products and advisory services.  The products and services provided by CIT include corporate finance, trade finance, transportation finance and vendor finance.

3.     Up until very recently, CIT had also participated in the student loan market through its Student Loan Xpress unit.  The majority of CIT's private student loans were made to non-traditional schools, which have a lower graduation rate than traditional schools (the graduation rate being a critical factor in a borrower's ability to pay back a loan).  CIT had been making private loans to students attending Silver State Helicopter ("Silver State"), a non-traditional school.

4.     Silver State promoted itself as a school that trained helicopter pilots with an eighteen month course that cost $70,000.  Far from being a legitimate enterprise, Silver State had the characteristics of a Ponzi scheme.   That is, the $70,000 (or more) paid by new students automatically went to the school's expenses (including the salaries of its instructors), as opposed to paying for the student's actual instruction.  Moreover, Silver State promised its students jobs as flight instructors upon their graduation.   In actuality, after a student had spent eighteen months at Silver State, the student was required to either borrow more money to pay for more tuition and instruction, or was expelled.

5.     As of December 31, 2007, Silver State students accounted for $196 million in CIT's outstanding student loans, an astounding 32 percent of CIT's $599.3 million of finance receivables related to private student loans.

6.     On January 31, 2008, Citibank announced that it would refuse to make any additional private student loans to Silver State students, due to its strong suspicion that the loans would not be repaid.   The following day, on February 1, 2008, Silver State declared bankruptcy

and ceased all operations. It was subsequently revealed that Silver State had assets of only $50,000 and liabilities in the tens of millions of dollars.

7.       On March 6, 2008, investors were shocked when Keefe, Bruyette & Woods issued an analyst report that lowered CIT's first quarter 2008 earnings per share estimate from $0.76 to $0.08. The report stated that CIT would be forced to write-down a significant portion of its private student loan portfolio.

8.       Upon the release of this news, the Company's shares fell $4.50 per share, or 22.10 percent, to close on March 6, 2008 at $15.86 per share, on unusually heavy trading volume.

9.       The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company had made tens of millions of dollars of loans to students attending Silver State, and that there was little chance of their repayment; (2) that the Company should have taken a write-down for the Silver State loans in its financial statements; (3) that as a result, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

10.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

13.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, CIT's principal executive offices are located within this Judicial District.

14.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.    Plaintiff, James Apostle, as set forth in the accompanying certification, incorporated by reference herein, purchased CIT's securities at artificially inflated prices during the Class Period and has been damaged thereby.

16.    Defendant CIT is a Delaware corporation with its principal executive offices located at 505 Fifth Avenue, New York, New York.

17.    Defendant Jeffrey M. Peek ("Peek") was, at all relevant times, the Company's Chairman and Chief Executive Officer ("CEO").

18.     Defendant Joseph M. Leone ("Leone") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Vice Chairman.

19.     Defendants Peek and Leone are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of CIT's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     CIT is a commercial finance company that provides financial products and advisory services.   The products and services provided by CIT include corporate finance, trade finance, transportation finance and vendor finance.

### Materially False and Misleading Statements Issued During the Class Period

21.     The Class Period begins on April 18, 2007.   On this day, the Company issued a press release entitled "CIT Reports Record First Quarter Results."   Therein, the Company, in

relevant part, stated:

> CIT Group Inc. (NYSE: CIT), today reported diluted earnings per share (EPS) of $1.37 for the quarter, up from $1.12 for the 2006 quarter. Net income available to common shareholders was $271.4 million and $229.7 million for the current and prior year quarters.
>
> Excluding noteworthy items, diluted EPS of $1.30 ($257.8 million net income available to common shareholders) for the quarter improved 15% from $1.13 ($230.6 million) in 2006. On this basis, return on average common equity was 14.8%, up from 14.2% last year.
>
> The current quarter noteworthy items increased EPS by $0.07 including a tax expense reduction of $20.6 million due to the release of certain international tax reserves ($0.10 diluted EPS increase) and an interest expense increase of $14.8 million due to certain costs related to early extinguishments of high cost debt ($0.04 diluted EPS decrease). See noteworthy items, which are detailed in the attached Non-GAAP tables on page 16.
>
> ***"CIT is off to a solid start in 2007 with our operating EPS increasing 15% from a year ago,"*** said Jeffrey M. Peek, Chairman and Chief Executive Officer of CIT. ***"The key drivers of our success have been broad-based and are rooted in the growth strategies and initiatives that are building CIT's future. Our sales force investment continues to pay dividends. Top-line revenue grew 14% as a result of our 24% increase in new business volume.***
>
> Our decision to acquire Citigroup's U.S. Business Technology Finance unit was a milestone for CIT and adds $2 billion in assets. This acquisition will increase our economies of scale and increase our global market share in the vendor finance sector. Looking ahead, we will continue to leverage our asset origination, risk management and client servicing capabilities to increase future shareholder returns." [Emphasis added.]

22.    That same day, the Company held an earnings conference call with investors and financial analysts.   During the call, Defendant Peek, in relevant part, stated:

> [Peek]: Second, in conjunction with our own internal review of Student Loan Xpress, a business we acquired in 2005, and under review by the New York Attorney General's Office, we took decisive action and placed three senior SLX executives on

administrative leave. Randy Chesler, President of CIT Consumer Finance, has assumed interim oversight of the organization.

CIT's solid reputation for many years has been built on a foundation of integrity and trust. ***The keystone of that reputation remains our commitment to maintaining best-in-class corporate governance practices and our internal code of business contact. We will continue to cooperate fully and closely with the Attorney General's Office as we go up to come to a timely resolution on this student lending matter.***

\*       \*       \*

[Analyst]: Hi, Jeff. Thanks for taking my question. I have one question on student lending and then a follow-up on your CLO business. So can we infer from your comments that you are definitively not selling your student lending business despite the premium that Sallie Mae received for their LBL?

[Peek]: Well, good morning. ***Our process on evaluating these businesses really hasn't changed much. We continue to review them on an annual basis as to whether they can get to our corporate hurdle rates and we try to tack back to that on a continuous basis.*** I think, as you know and a number of other close observers of the Company, SLX has really done a terrific job in terms of growth. They've really exceeded all of our growth objectives. We bought it two years ago. The Company is more than twice the size of when we bought it, so we continue to review all our businesses and are very committed to fixing or divesting those that we don't think can get through the corporate hurdle rate within a reasonable period of time, and that will really apply to SLX just the same way it applies to all of the other business [Emphasis added.]

23.      On April 24, 2007, CIT participated in the American Financial Services Association ("AFSA") 7th Financial Industry Conference for International Fixed-Income Investors.   At the conference, the following was stated:

[Unidentified Company Participant]: ***And then finally our student lending business, which is another one that's been in the news for a couple of reasons. One, on the legislative front, you've all heard about some of the legislation being contemplated in Washington around changes to the program, whether it be changing the level of guarantee, or changing the spread that can be offered to the obligors. So there's a number of uncertainties in***

*this business. This is a portfolio of a business that we acquired a couple years ago. We have been quite pleased with the performance of this business; we have grown it to more than twice the size it was when we first acquired it. It continues to make good progress in generating the returns that we're expecting; so those metrics are quite positive.*

*       *       *

But again, there is uncertainty on the legislative front; we have to see how that plays out because it could potentially impact the economics of the business. And then, secondly, there has been some investigation around some of the conduct of business, effectively, between lenders and school administrators. And that's something we are quite concerned about; it's something that we take very seriously when we consider the way in which we conduct ourselves from a business point of view. The New York attorney general has been investigating various lenders, various schools, and has begun settling with a number of companies that are lenders. It's something that that investigation, we're actively providing whatever assistance we can, whether it be with the New York attorney general's office or Capitol Hill, we want to be constructive in the whole process.

But we also take our governance practices very seriously, and among the areas of investigation, there was a question around a few of our executives prior to us acquiring the business that related to an offering of shares on a private basis. And, again, we view integrity and trust very highly; we think it's critical to CIT and the way we conduct business, and we've put those three individuals on a leave of absence pending our own internal investigation. So, again, I just want to reinforce the fact that integrity is critically important to CIT and we hold ourselves to very high standards in that regard. [Emphasis added.]

24.   On May 8, 2007, CIT filed its Quarterly Report with the SEC on Form 10-Q.  The

Company's 10-Q was signed by the Individual Defendants, and in relevant part, stated:

**Student Loan Investigation**

***Student Loan Xpress, Inc. ("SLX"), a subsidiary of CIT, is engaged in the student lending business. During the quarter ended March 31, 2007, in connection with investigations into the relationships between student lenders and the colleges and universities that recommend such lenders to their students, CIT and/or SLX have received requests for information from the***

8

*Attorneys General of the State of New York and several other states and federal government bodies.* CIT engaged outside legal counsel to conduct a review of the business practices that are the subject of the investigations and to support CIT in responding to the information requests. The internal review is ongoing, and CIT is fully cooperating with the investigations.

*       *       *

**Student Lending (Student Loan Xpress)**

*The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $9.9 billion at March 31, 2007, representing 13% of owned and 12% of managed assets.* Loan origination volumes were $1.8 billion and $1.6 billion for the quarters ended March 31, 2007 and 2006. Student Loan Xpress has arrangements with certain financial institutions to sell selected loans and works jointly with these financial institutions to promote these relationships. [Emphasis added.]

25.     On July 18, 2007, the Company issued a press release entitled "CIT Reports Second Quarter Results." Therein, the Company, in relevant part, stated:

Quarterly Financial Highlights

- ***Loss of $0.70 per share, with $2.58 per share loss on home lending business exit***

- ***$0.71 per share gain on sale of U.S. construction portfolio***

- Completed Healthcare REIT and CLO transactions

- Commercial credit metrics remain favorable

*CIT Group Inc. (NYSE: CIT), today reported a diluted loss per share of $0.70 for the 2007 quarter, versus $1.16 of earnings per share for the 2006 quarter.* The net loss attributable to common shareholders was $134.5 million for the current quarter, versus $236.0 million income for the prior year quarter. [Emphasis added.]

26.     Also on July 18, 2007, the Company held an earnings conference call with investors and financial analysts. During the call, Defendants Peek and Leone, in relevant part, stated:

[Peek]: Finally, in consumer small business lending, **the performance and growth of our student loan business has been overshadowed by the uncertainty of pending legislation on Capitol Hill. As the fog lessens there, we're closely monitoring the situation and evaluating how well our model would perform in the face of shifting industry dynamics. In the immediate future, we expect this business to have a solid second half of the year.** As typically their third quarter is the strongest origination quarter and the fourth quarter benefits from increased home loan sales.

\*       \*       \*

[Analyst]: One final question. If you decide to exit the student lending business next, would we see anywhere near as big an impact on your earnings?

[Leone]: You mean in terms of the operating earnings contribution? I would say no.

[Analyst]: And the write-down?

[Leone]: **We didn't evaluate that. As I said before, we have about $300 million of goodwill and I think as Jeff said, the business is twice as big as it was when we bought it.**

[Analyst]: But there's almost no credit risk in that business.

[Leone]: That's right. And all those loans, the historical book is at the old rate or the grandfathered rate, so to speak. [Emphasis added.]

27.     On August 7, 2007, CIT filed its Quarterly Report with the SEC on Form 10-Q.

The Company's 10-Q was signed by the Individual Defendants, and, in relevant part, stated:

> **Student lending delinquencies were $487.7 million (5.03%) at June 30, 2007, up from $452.9 million (4.77%) at March 31, 2007 and $400.1 million (4.71%) at December 31, 2006.** The higher delinquency in the student loan portfolio is not indicative of potential loss due to the underlying U.S. government guarantee of 97%-98% of the remaining principal amount.

\*       \*       \*

> **Student Lending (Student Loan Xpress)**

10

> The Consumer Finance student lending portfolio, which is
> marketed as Student Loan Xpress, totaled $10.3 billion at June 30,
> 2007, representing 14% of owned and 13% of managed assets.
> Loan origination volumes were $1.3 billion for both quarters ended
> June 30, 2007 and 2006 and $3.2 billion and $2.9 billion for the six
> months then ended. Student Loan Xpress has arrangements with
> certain financial institutions to sell selected loans and works jointly
> with these financial institutions to promote these relationships.
> [Emphasis added.]

28.     On September 11, 2007, Defendant Peek made the following statements at the

Lehman Brothers 5th Annual Services Conference:

> Let me just hit on student lending here. This is not a big business
> for us profit-wise. It accounts for less than 5% of our profit plan,
> but it obviously has been getting a lot of attention. ***Operationally,
> the business is in the midst of its strongest operating quarter.*** We
> had record originations in July and the school channel in August.
> We were up 49% over loans originated in the school channel in
> 2006. [Emphasis added.]

29.     On October 17, 2007, the Company issued a press release entitled "CIT Reports

Third Quarter Results." Therein, the Company, in relevant part, stated:

> ***CIT Group Inc. (NYSE: CIT), today reported diluted net loss per
> share of $0.24 for the third quarter of 2007, due to the home
> lending charge, versus $1.44 of earnings per share for the 2006
> quarter.*** Net loss attributable to common shareholders was $46.3
> million for the current quarter, versus net income of $290.8 million
> last year. [Emphasis added.]

30.     Also on October 17, 2007, the Company conducted a conference call with

investors and financial analysts. During the call, Defendant Peek made the following statements:

> ***And finally, an update on student lending. Our team did a great
> job delivering record new business volume in what is seasonally
> the most important quarter of the year.*** School channel
> originations were up 17% from a year ago, and that is important
> because with the new legislation, in-school originations are, far
> and away, the most profitable for us. [Emphasis added.]

31.     On November 5, 2007, CIT filed its Quarterly Report with the SEC on Form 10-

Q. The Company's 10-Q was signed by the Individual Defendants, and, in relevant part, stated:

**Student Lending (Student Loan Xpress)**

***The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $11.5 billion at September 30, 2007, representing 14.9% of owned and 13.7% of managed assets. Loan origination volumes were $1.8 billion for the quarters ended September 30, 2007 and 2006 and $5.0 billion and $4.7 billion for the nine months then ended.*** Student Loan Xpress has arrangements with certain financial institutions to sell selected loans and works jointly with these financial institutions to promote these relationships. [Emphasis added.]

      32.    On November 15, 2007, the Company participated in the Merrill Lynch Banking and Financial Services Investor Conference.   During the conference, Defendant Leone, in relevant part, stated:

[Audience member]: Joe, could you talk about the student lending business? There is been a lot of change in that business in the last 12 months from just what's going on on the M&A front and on the governmental front?

\*      \*      \*

[Leone]: That's great. I would add, we like the business. Until 2007, it was liquid, it had a low risk element to it, it was leverageable. We had a company that we were creating operating efficiencies with, but then clearly those laws changed when that happened. And as Ken said, I think the couple of things that we have to do is we have to remodel the business because some of the parts of the business do not work under existing legislation. ***So part of the efforts we'll have over the next few months is remodeling the business, as Ken said -- more focus on the school channel, less focus on direct marketing, dropping envelopes into everybody's mailbox and see who responds. It's too expensive relative to the rate.***

The other thing that Ken mentioned is, we have to see how the market responds in terms of how the borrower benefits gets priced into the product. And then last, we continue to keep our eye on what's going on in the M&A market. Clearly, there's deals dangling out there that we would like to see how they -- whatever happens to them. I'm not expressing the view one way or the other on them, but there's a lot of uncertainty in the deal side of that.

> *Having said that, there is interest in this business because it has --*
> *-- it really does have a good growth demographic as many of you*
> *think about who would take a student loan and why. And that's*
> *one of the reasons we got into it. It still has that good growth*
> *demographic. The question is, how much ROE can you get on*
> *even the limited amount of E that you have to put into it.*
> [Emphasis added.]

33.     On December 11, 2007, the Company participated in the Goldman Sachs

Financial Services Conference.   During the conference, Defendant Peek made the following

statements:

> Consumer -- just to round it out, *we are redefining our student*
> *lending strategy in light of the new legislation. We have*
> *effectively exited the consolidation loan and the private loan*
> *channels and we're concentrating on the government guaranteed*
> *school channel. In that channel, we really have experienced good*
> *success and good growth and we'll continue to evaluate our*
> *strategy and the competitive landscape as that becomes a little*
> *clearer.* Finally, we continue to manage down home lending but
> we'll come back to that in great detail shortly. [Emphasis added.]

34.     On January 17, 2008, the Company issued a press release entitled "CIT Reports

Fourth Quarter Results."  Therein, the Company, in relevant part, stated:

> CIT Group Inc. (NYSE: CIT) today reported a net loss of $130.7
> million, or $0.69 per share, for the fourth quarter of 2007,
> reflecting the impact of several noteworthy items discussed below,
> versus net income of $259.3 million, or $1.28 of diluted earnings
> per share, for the 2006 quarter. For the full year, the net loss
> attributable to common shareholders was $111.0 million for 2007,
> versus net income of $1,015.8 million last year.
>
> *"We were not pleased with our reported loss this quarter, which*
> *primarily related to charges on our home lending and student*
> *lending businesses -- two sectors that have recently experienced*
> *significant change."*
>
>            \*     \*     \*
>
> Fourth quarter results include the following previously disclosed
> items:

- A $297 million increase in reserves for credit losses, including the establishment of a $250 million reserve for the held-for-investment home lending portfolio and increased general reserves primarily for unsecured consumer loans (decrease to EPS of $0.96);

- Charges of $42 million related to home lending receivables held for sale, including those sold during the quarter (decrease to EPS of $0.14);

- ***A $313 million goodwill and intangible asset impairment charge related to the Company's student lending business, reflecting decreased market valuations for student lending businesses, and lower profit expectations as a result of higher funding costs (decrease to EPS of $1.59);*** and

- A pre-tax gain of $268 million on the sales of CIT's interest in its Dell Financial Services (DFS) joint venture and of its U.S. Systems Leasing portfolio (increase to EPS of $0.85). [Emphasis added.]

35. Also on January 17, 2008, the Company held an earnings conference call with investors and financial analysts. During the call, Defendants Leone and Peek, in relevant part, stated:

> [Leone]: ***Given the change in the student lending landscape, with declining pier valuations, plus higher funding costs for this asset class--as a matter of fact, ABS spreads are higher by about 50 basis points today than they were when we started the second quarter into the third quarter.*** We ended the second quarter into the third quarter. As a result of these two factors, our estimates of fair value no longer supported the goodwill and intangibles for the student lending business. We took a non-cash write, it had no impact on our tangible book or our capital metrics, but it did reduce income by almost the full amount as there was very little tax benefit booked on this charge.
>
> *       *       *
>
> [Peek]: ***We'll also continue to modify the student lending business model to reflect the new, market, and legislative realities. By that, we'll continue to de-emphasize consolidation loans and private loans in favor of guarantee loans originated in the school channel.*** As you know, securitization markets are an

important source of funding for these assets, so we'll have to monitor the condition of that market closely. [Emphasis added.]

36.     On February 8, 2008, the Company participated in the Credit Suisse Group

Financial Services Forum.   During the forum, Defendant Peek made the following statements:

> We did, however, as I think many of you know, report a loss for the year due to the charges we took in our consumer businesses. *About $1.5 billion against our home lending portfolio and over $300 million in writing-off the goodwill and intangibles from our student lending acquisition in 2005.*
>
> *       *       *
>
> Despite, certainly, in the second half of 2007, despite a lot of the market dislocation, we clearly stayed open for business with our customers. As the year progresses, we went through 2007, we started to significantly deemphasize our consumer businesses. In August, we closed our origination network for home lending and as we got into the new legislation in student lending in the fourth quarter, we changed our business platform just to conform to the change of focus in the new legislation.
>
> *       *       *
>
> *In terms of student lending, let me just give you a brief update on that. We wrote off all the goodwill and the intangibles, a little over $300 million in the fourth quarter. We have effectively stopped making new consolidation in private loans. We're still making the FFELP loans in the school channel. They're not as profitable as they were six months ago.* Here, we are going to continue to monitor the competitive and the legislative landscape and look at our strategic alternatives over time.
>
> *       *       *
>
> *Our largest industry concentration is student lending, where 95% of the assets are FFELP loans guaranteed by the government as to 97% principal.* [Emphasis added.]

37.     On February 29, 2008, CIT filed its Annual Report with the SEC on Form 10-K.

The Company's 10-K was signed by the Individual Defendants, and, in relevant part, stated:

> *Consumer delinquency increased in 2007 driven by Student Lending.* Delinquencies on student loans for which there is a 97% government guarantee totaled $569.1 million (5.23%) and $399.0

million (4.88%) at December 31, 2007 and 2006. Higher delinquency in this component of our student loan portfolio is not indicative of potential loss due to the underlying U.S. government guarantee on the majority of the loan balance. Delinquencies on non-government guaranteed private loans totaled $12.7 million (2.03%) and $1.1 million (0.35%) at December 31, 2007 and 2006. Approximately $445 million (75%) of the private loan portfolio is not yet in repayment status, which begins upon graduation, or when students no longer attend the school. *As more loans enter repayment status, it is possible that we will experience increasing delinquencies in this portfolio.*

*       *       *

**Student Lending (Student Loan Xpress)**

The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $11.6 billion at December 31, 2007, representing 15.1% of owned and 13.9% of managed assets. Loan origination volumes totaled $5.9 billion in 2007, $6.3 billion in 2006, and $2.4 billion for the period of CIT ownership beginning in February 2005. Student Loan Xpress has arrangements with certain financial institutions to sell selected loans and works jointly with these financial institutions to promote these relationships. These sales are held on-balance sheet and are further described in "On-balance Sheet Securitization Transactions".

*       *       *

*The Company ceased originating private (unguaranteed) student loans in late 2007 based on an evaluation of the return and risk characteristics of this student lending product, but has continued to fund pre-existing loan commitments. In February 2008, a private pilot training school filed bankruptcy. Our student lending business had originated private (unguaranteed) loans to students of the school, which totaled approximately $196 million in total principal and accrued interest as of December 31, 2007. We ceased originating new loans to students of this school in mid-2007. Approximately $17 million of the total loans represents loans to students who have completed their education (loans in "repayment"); the remainder is to students who have not yet completed their training. Loans in repayment to students of this school that were past due loans 60 days or more were approximately $2.0 million at December 31, 2007. Collectibility of the outstanding principal and interest balance of loans that have both reached, and have not yet reached repayment status,*

> ***will depend on a number of factors, including the student's
> current ability to repay the loan, whether a student has completed
> the licensing requirements, whether a student can complete any
> remaining education requirements at another institution
> (including making further tuition payments and accessing
> previous education records) and satisfy any remaining licensing
> requirements.***
>
> ***Management is currently evaluating the collectibility and
> projected cash flows related to these loans. Given that the loans
> are unsecured and that uncertainties exist regarding collection,
> management currently expects that additional reserves may be
> required in 2008 in connection with these loans.*** [Emphasis
> added.]

38.     The statements contained in ¶¶ 21-37 were materially false and misleading when
made because defendants failed to disclose or indicate the following: (1) that the Company had
made tens of millions of dollars of loans to students attending Silver State, and that there was
little chance of their repayment; (2) that the Company should have taken a write-down for the
Silver State loans in its financial statements; (3) that as a result, the Company's financial
statements were not prepared in accordance with GAAP; (4) that the Company lacked adequate
internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial
statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

39.     Prior to the Company's participation in the Credit Suisse forum on February 8,
2008 and the filing of its 10-K on February 29, 2008, clues about the true nature of Silver State's
operations started to come to light.  For instance, on January 31, 2008, Citibank announced that it
would refuse to make any additional private student loans to Silver State students, due to its
strong suspicion that the loans would not be repaid.   The following day, on February 1, 2008,

Silver State declared bankruptcy and ceased all operations.   It was subsequently revealed that Silver State had assets of only $50,000 and liabilities in the tens of millions of dollars.

40.    Then on March 6, 2008, Keefe, Bruyette & Woods issued an analyst report on CIT, and stated that it was lowering its first quarter 2008 earnings estimate to $0.08 per share from $0.76 per share due to its view that "the company will have to write-down a significant portion of its private student loan portfolio."

41.    On this news, the Company's shares fell $4.50 per share, or 22.10 percent, to close on March 6, 2008 at $15.86 per share, on unusually heavy trading volume.

42.    That same day, the *Associated Press* published an article entitled "CIT shares plunge on potential write-off."   The article, in relevant part, stated:

> ***Shares in CIT Group Inc. plunged Thursday after an analyst slashed its earnings target for the lender on concerns that the company will take a massive charge to write down its student loan portfolio.***
>
> ***CIT shares lost $4.50, or 22.1 percent, to $15.86 Thursday. Earlier in the session the stock hit a 52-week low of $15, well below the previous mark of $19.05.***
>
> Keefe, Bruyette & Woods analyst Sameer Gokhale now expects the company to earn 8 cents per share in the first quarter instead of his previous estimate of 76 cents per share.
>
> ***"We believe there is increased risk that the company will have to charge off $179 million of private student loans made to students of a flight school which recently filed for bankruptcy,"*** he wrote in a note to investors.
>
> ***He said the students did not receive their licenses and are less likely to be able to repay the loans.*** Because the loans are private, they cannot be written off in personal bankruptcy, he said. [Emphasis added.]

## CIT'S VIOLATION OF GAAP RULES
## IN ITS FINANCIAL STATEMENTS
## <u>FILED WITH THE SEC</u>

43.     These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

44.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

45.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated

(FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)     The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of

Concepts No. 2, ¶95).

46.     The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased CIT's securities between April 18, 2007 and March 5, 2008, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CIT's securities were actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CIT or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

50.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CIT; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

53.     The market for CIT's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements, and failures to disclose, CIT's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired CIT's securities relying upon

the integrity of the market price of CIT's securities and market information relating to CIT, and have been damaged thereby.

54.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of CIT's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

55.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about CIT's financial well-being, business relationships, and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of CIT and its financial well-being, business relationships, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

56.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

57.     During the Class Period, Plaintiff and the Class purchased CIT's securities at

artificially inflated prices and were damaged thereby.  The price of CIT's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

58.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding CIT, their control over, and/or receipt and/or modification of CIT's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CIT, participated in the fraudulent scheme alleged herein.

59.     During the Class Period, the defendants took advantage of the artificially inflated price of the Company's securities to complete an equity offering.  On October 17, 2007, the Company completed an equity offering of 240,000 shares of its common stock, and received gross proceeds of over $8 million by selling its stock to the public at a price of $33.93 per share.

60.     Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 464,651 shares of the Company's stock for gross proceeds of $25,551,041, including over $5.4 million in gross proceeds received by Defendant Leone.  This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| September 19, 2007 | Marsiello, Lawrence A. | 56,215 | $42.00 | $2,361,030 |
| August 2, 2007 | Leone, Joseph M. | 400 | $40.22 - $40.28 | $16,000 |
| August 2, 2007 | Leone, Joseph M. | 300 | $40.17 | $12,000 |
| August 1, 2007 | Leone, Joseph M. | 2,500 | $40.44 - $40.99 | $102,000 |
| August 1, 2007 | Leone, Joseph M. | 100 | $40.40 | $4,040 |
| August 1, 2007 | Leone, Joseph M. | 24,600 | $40.01 - $40.37 | $989,000 |
| August 1, 2007 | Leone, Joseph M. | 6,600 | $40.00 | $264,000 |
| May 3, 2007 | Taylor, William J. | 7,283 | $59.01 - $60.02 | $433,000 |
| May 3, 2007 | Taylor, William J. | 1,800 | $60.12 - $60.30 | $108,000 |
| May 3, 2007 | Taylor, William J. | 100 | $60.07 | $6,007 |
| May 3, 2007 | Marsiello, Lawrence A. | 37,483 | $59.00 - $59.28 | $2,217,000 |
| May 3, 2007 | Marsiello, Lawrence A. | 14,332 | $59.29 - $60.20 | $856,000 |
| May 3, 2007 | Marsiello, Lawrence A. | 2,600 | $59.28 | $154,000 |
| May 3, 2007 | Marsiello, Lawrence A. | 700 | $60.22 - $60.30 | $42,000 |
| May 3, 2007 | Marsiello, Lawrence A. | 1,100 | $60.21 | $66,000 |
| May 3, 2007 | Leone, Joseph M. | 41,538 | $59.00 - $59.27 | $2,456,000 |
| May 3, 2007 | Leone, Joseph M. | 17,692 | $59.29 - $59.59 | $1,052,000 |
| May 3, 2007 | Leone, Joseph M. | 1,400 | $59.28 | $83,000 |
| May 3, 2007 | Leone, Joseph M. | 6,300 | $59.61 - $60.30 | $378,000 |
| May 3, 2007 | Leone, Joseph M. | 2,200 | $59.60 | $131,000 |
| May 3, 2007 | Ingato, Robert J. | 15,283 | $59.01 - $59.53 | $906,000 |
| May 3, 2007 | Ingato, Robert J. | 3,617 | $59.76 - $60.30 | $217,000 |
| May 3, 2007 | Ingato, Robert J. | 100 | $59.64 | $5,964 |
| May 3, 2007 | Hallman, Thomas B. | 39,700 | $59.00 - $59.27 | $2,348,000 |
| May 3, 2007 | Hallman, Thomas B. | 11,676 | $59.29 - $59.87 | $696,000 |

| May 3, 2007 | Hallman, Thomas B. | 1,800 | $59.28 | $107,000 |
| May 3, 2007 | Hallman, Thomas B. | 2,200 | $59.94 - $60.30 | $132,000 |
| May 3, 2007 | Hallman, Thomas B. | 200 | $59.93 | $12,000 |
| April 18, 2007 | Wolfert, Frederick E. | 57,932 | $57.03 - $57.30 | $3,312,000 |
| April 18, 2007 | Wolfert, Frederick E. | 106,900 | $56.83 - $57.02 | $6,085,000 |
| | **TOTAL:** | **464,651** | | **$25,551,041** |

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

61.     At all relevant times, the market for CIT's securities was an efficient market for the following reasons, among others:

(a)     CIT's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, CIT filed periodic public reports with the SEC and the NYSE;

(c)     CIT regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     CIT was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

62.     As a result of the foregoing, the market for CIT's securities promptly digested

current information regarding CIT from all publicly-available sources and reflected such information in the price of CIT's securities.  Under these circumstances, all purchasers of CIT's securities during the Class Period suffered similar injury through their purchase of CIT's securities at artificially inflated prices and a presumption of reliance applies.

<u>**NO SAFE HARBOR**</u>

63.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CIT who knew that those statements were false when made.

<u>**FIRST CLAIM**</u>
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
<u>**Promulgated Thereunder Against All Defendants**</u>

64.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase CIT's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

66.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CIT's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

67.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CIT's financial well-being, business relationships, and prospects, as specified herein.

68.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CIT's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CIT and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business

which operated as a fraud and deceit upon the purchasers of CIT's securities during the Class Period.

69.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

70.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CIT's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in

failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CIT's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of CIT's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired CIT's securities during the Class Period at artificially high prices and were damaged thereby.

72.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that CIT was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their CIT securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     The Individual Defendants acted as controlling persons of CIT within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.     As set forth above, CIT and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of

the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

      (a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

      (b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      (d)    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury

Dated:  August 21, 2008.

                Respectfully submitted,


            By:   *Evan J. Smith (ES3254)*
                 **Evan J. Smith (ES3254)**
                 **BRODSKY & SMITH, LLC**
                 **240 Mineola Blvd.**
                 **Mineola,  NY  11501**
                 **(516-741-4977**
                 **516-741-0626**

**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
D. Seamus Kaskela
skaskela@sbtklaw.com
David M. Promisloff
dpromisloff@sbtklaw.com
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)